IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-298

No. COA21-297

Filed 3 May 2022

Carteret County, Nos. 19CRS000418, 19CRS000689

STATE OF NORTH CAROLINA

v.

JAMES MATTHEW KITCHEN

Appeal by Defendant from judgment entered 18 November 2020 by Judge Joshua W. Willey, Jr., in Carteret County Superior Court. Heard in the Court of Appeals 25 January 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kathryne E. Hathcock, for the State-Appellee.*

*Thomas, Ferguson & Beskind, by Kellie Mannette, for Defendant-Appellant.*

COLLINS, Judge.

¶ 1    Defendant James Matthew Kitchen appeals a judgment entered upon his conviction for driving while impaired, his stipulation to three prior driving while impaired convictions resulting in Defendant attaining habitual impaired driving status, and his guilty plea of attaining habitual felon status. Defendant argues that the trial court erred by denying his motion to suppress his medical records, which included evidence of his blood alcohol concentration level, because disclosure of the

medical records to the State pursuant to N.C. Gen. Stat. § 8-53 violated his Fourth

Amendment right to be free from warrantless search and seizure, and that admitting

the records at trial was prejudicial error. Assuming arguendo that the trial court

erred by denying Defendant's motion to suppress and admitting the medical records

at trial, any error was harmless in light of the overwhelming evidence of Defendant's

guilt of driving while impaired by driving "[w]hile under the influence of an impairing

substance" under N.C. Gen. Stat. § 20-138.1(a)(1). Accordingly, there is no prejudicial

error in the trial court's judgment.

## I. Background

Defendant was arrested on 1 May 2017 for driving while impaired. Defendant

was indicted by superseding indictment for habitual driving while impaired and

attaining habitual felon status.[1] The State filed an Amended Motion For Production

of Medical Records on 22 June 2020, moving the court to enter an order directing the

custodian of records at Carteret Health Care to disclose to the Carteret County

District Attorney, Defendant's medical records, including blood tests and toxicology

screens, relating to his treatment at Carteret Health Care on or about 1 May through

---

[1] On 3 June 2019, Defendant was indicted by the Carteret County Grand Jury for Habitual Impaired Driving. The Grand Jury issued superseding indictments for the same offense on 19 August 2019 and 13 July 2020. On 19 August 2019, the Grand Jury also indicted Defendant for attaining habitual felon status, with a superseding indictment issued on 13 July 2020.

2 May 2017. In support of its motion, the State alleged as follows:

1. That Defendant is currently charged with Habitual Impaired Driving, Assault on a Female, Resisting Public Officer.

2. All the above stated charges resulted from an incident that occurred in the evening of May 1, 2017.

3. That Defendant was arrested for impaired driving. Prior to his arrest, Officer's (sic) asked him to submit to a PBT (Portable Breath Test) and the results of that test indicated a positive reading for alcohol. The number results are not admissible at trial.

4. Officer's (sic) noted a strong odor of alcohol on Defendant's breath and witnesses stated that a male inside the same type of vehicle that was stopped appeared intoxicated.

5. During processing, the Defendant was combative, aggressive with officers, and refused to submit to an ECIR II breath test.

6. That Officers did not seek a search warrant for a blood test and the Defendant did not consent to a blood test.

7. That the Carteret County Detention Center refused to accept Defendant into the jail without medical clearance which resulted in Defendant being transported to Carteret Health Care/Carteret General Hospital.

8. Medical Staff would not release Defendant and Defendant remained at the hospital for treatment.

9. These records are necessary for the prosecution of Defendant for Habitual Impaired Driving.

10. Upon information and belief, Defendant's medical records are in the custody of Carteret Health Care in Carteret County, N.C. and may contain information regarding Defendant's impairment within a relevant time after driving and information regarding what substances Defendant consumed leading to his impaired condition.

11. That production and disclosure of these records may be compelled pursuant to provisions by N.C. General Statute 8-53 which states that "any resident or presiding judge . . . either at trial or prior thereto . . . may compel disclosure (of medical records) if in his opinion disclosure is necessary to a proper administration of justice."

12. Federal HIPAA laws allow the disclosure of protected health information during any judicial hearing when pursuant to a court order, subpoena, discovery request, or other lawful process, 45 C.F.R. § 164.512(e)(1)(i), as long as the information is "relevant and material to a legitimate law enforcement inquiry and limited in scope as reasonably practicable". 45 C.F.R. § 164.512(f)(1)(ii).

13. Disclosure of this information is in the best interest of justice and the enforcement of the laws of the State of North Carolina. The information sought in Defendant's medical records is relevant and material to the prosecution of Defendant for Driving While Impaired. The information sought is not available to the State from any other appropriate source and is limited in scope as reasonably practicable.

14. The State believes the information contained in the medical records described is necessary and relevant to this case and that it is necessary to the proper administration of justice for the Court to enter an order compelling disclosure of the above-described records to the Carteret County District Attorney's office pursuant to N.C. [Gen. Stat. §] 8-53.

The trial court granted the motion, finding and concluding that "the proper administration of justice requires that these records be provided to the State of North Carolina for the prosecution of this case." The records were released to the State.

On 23 October 2020, Defendant filed a motion to suppress the medical records asserting that, (1) the State failed to meet the requirements of N.C. Gen. Stat. § 8-53

by failing to submit "an affidavit or other similar evidence setting forth facts or circumstances sufficient to show reasonable grounds to suspect that a crime has been committed, and that the records sought are likely to bear upon the investigation of that crime," as required by *State v. Scott*, 269 N.C. App. 457, 462, 838 S.E.2d 676, 680 (2020), *rev'd on other grounds*, 377 N.C. 199, 2021-NCSC-41, and (2) disclosure of the medical records violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article I, Sec. 19 and/or 23 of the North Carolina Constitution. The motion was accompanied by Defendant's affidavit, in which he averred that he "never consented to the State obtaining [his] medical records from Carteret Health Care for May 1st and 2nd, 2017" and "never saw a search warrant for those records."

¶ 5 Defendant's motion came on for hearing on 9 November 2020. Following argument, the trial court denied the motion, finding that the State had filed a Motion for Production pursuant to N.C. Gen. Stat. § 8-53, and that "[a]lthough it was not supported by affidavit, the motion did contain sufficient other information as required by [section] 8-53 for the [trial court] to be able to make an independent determination that the production of the records was necessary for the proper administration of justice." The trial court further concluded, "[t]here is a presumption that statutes are constitutional. The Court is not going to hold that [section] 8-53 violate[s] the federal or state constitution. . . . Defendant's motion to suppress is, therefore, denied."

¶ 6 Also on 9 November 2020, Defendant admitted and stipulated to driving while impaired convictions on 10 December 2012, 20 December 2012, and 8 January 2013. The case proceeded to trial and the evidence and arguments of counsel tended to show the following:

**A. Kirsten Lambert**

¶ 7 Kirsten Lambert, an assistant general manager at the Taco Bell in Morehead City, North Carolina, was working the Taco Bell drive-through on the evening of 1 May 2017 when a vehicle pulled up to the drive-through window. A woman was driving the vehicle, and a man was in the passenger's seat. "The female driver was nervous and scared. You could see she was visibly shaken. The male passenger seemed to be kind of sloppy and he was slurring his speech. So he appeared intoxicated." Ms. Lambert then, "quietly asked the female driver if she was okay because she seemed scared. And she quietly said 'yes.'" After the vehicle drove away, Ms. Lambert called 911, describing the situation and her concerns, and gave the operator the vehicle's license plate number and description. An officer arrived at the Taco Bell and took a written statement from Ms. Lambert. The statement was admitted into evidence. Ms. Lambert reported in the statement that the male passenger appeared "intoxicated" and "irritated."

**B. Sergeant Kristopher Cummings**

¶ 8 Sergeant Kristopher Cummings of the Morehead City Police Department

("MCPD") was on duty on the night of 1 May 2017 when he received a dispatch to perform a "welfare check" on a female occupant of a blue Oldsmobile, last seen leaving the Morehead City Taco Bell. Within a "minute or two" of receiving the dispatch, Sergeant Cummings spotted an Oldsmobile that matched the description of the vehicle reported for the welfare check. The Oldsmobile was speeding 55 miles-per-hour in a 35 mile-per-hour zone. Sergeant Cummings stopped the Oldsmobile approximately 2 miles from the Taco Bell and approached the vehicle on foot.

¶ 9        Defendant was in the driver's seat and there was a female in the front passenger's seat. There was "a strong odor of alcohol coming from the passenger area. The female passenger was nervous, seemed very anxious, kind of matched the description given by dispatch of the welfare check." Sergeant Cummings had Defendant step out of the vehicle because, based on the call, "there was a possible domestic, or an assault, or something to do with the two of them . . . but also that there was a strong odor of alcohol," and he wanted to separate Defendant from the cabin area of the car. Sergeant Cummings determined the smell of alcohol was coming from Defendant.

¶ 10       Sergeant Cummings was trained in detecting and apprehending impaired drivers. Defendant "had a slur to his speech, . . . [h]is eyes were glassed over," and he was "unsteady on his feet." Defendant "could not stand up straight without swaying, moving, shifting his feet and shifting his weight." Within five minutes of

Sergeant Cummings having stopped Defendant, Officer Tracy Bruno of the MCPD patrol division arrived. Sergeant Cummings turned the investigation over to Officer Bruno.

## C. Officer Tracy Bruno

¶ 11        When Officer Bruno arrived at the scene, she performed a welfare check on the female passenger, and noted that she "had a fresh contusion on her face. She had blood on her lip and she had blood splatter on her cheek area and . . . had been crying and upset." Officer Bruno then approached the male driver, whom she identified at trial as Defendant. Officer Bruno testified, "So when I walked up to him, I noticed right away that I could smell alcohol, an alcoholic beverage. He had red, glassy eyes. And when I started speaking to him, he was slurring his speech. And he did state to me that he shouldn't have been driving and that he was also revoked." Officer Bruno noted that Defendant "looked sloppy, like kind of disheveled." Officer Bruno suspected alcohol was a factor because Defendant "was displaying, showing signs of impairment. He was unsteady on his feet. I smelled a very strong odor of alcohol. He had red, glassy eyes. He slurred his speech while talking to me. I mean he couldn't stand up straight by any means."

¶ 12        Officer Bruno was trained in apprehending and detecting impaired drivers and in conducting a portable breathalyzer test ("PBT"), and was certified to perform standardized field sobriety testing. At the scene of the stop, Officer Bruno

administered a PBT to Defendant. Although Defendant was uncooperative, the PBT registered a breath sample that was positive for alcohol. Officer Bruno testified that, despite Defendant's failure to cooperate, the positive result on the sample was reliable.

¶ 13 Defendant agreed to submit to standardized field sobriety testing. Officer Bruno administered three tests: the horizontal gaze nystagmus ("HGN"), one leg stand ("OLS"), and walk and turn ("WAT"). On the HGN test, Defendant manifested all six "clues of impairment." Officer Bruno testified that these clues indicate impairment. On the WAT test, Defendant started early, did not follow directions, was unable to walk heel-to-toe in a straight line, was unsteady on his feet, and would not complete the test. Officer Bruno testified, "usually when you perform a test, people can usually follow enough instructions to try to complete the whole test or, you know, at least even if they're impaired or something, they still try to complete the [test]. [But Defendant] just completely quit after the first nine steps." Similarly, on the OLS test, Defendant started early, was unsteady, did not follow directions, and would not complete the test. As a "safety matter," because they were on the side of a highway, Officer Bruno terminated the testing process. Officer Bruno testified that these clues–including failure to follow instructions, starting early, and inability or unwillingness to complete the tests–indicate impairment.

¶ 14 When asked whether Officer Bruno was "able to form an opinion satisfactory

to [her]self as to whether the defendant consumed a sufficient quantity of an impairing substance as to appreciably impair his mental or physical faculties," Officer Bruno testified that it was her opinion that Defendant was "appreciably impaired." Officer Bruno's opinion was based on her interactions with Defendant for the twenty minutes she spent with him prior to his arrest, what she smelled, what she saw, and his performance on the tests.

¶ 15        Officer Bruno arrested Defendant for driving while impaired. She drove Defendant in her patrol car to MCPD. Defendant was admitted for processing and an "observation period." Officer Bruno notified Defendant of his rights in accordance with N.C. Gen. Stat. § 20-16.2(a) for "implied-consent" offenses, including impaired driving. Defendant refused to sign paperwork acknowledging that he understood his rights.

¶ 16        Defendant began to act "irate" and "belligerent." After Defendant requested to call an attorney, Officer Bruno allowed Defendant access to the phone and offered to dial if Defendant provided a phone number. Defendant yelled at Officer Bruno that it was "[her] f-ing job to call his attorney, not [his]." When Officer Bruno explained to Defendant that she did not have phone numbers for lawyers after hours, Defendant yelled that Officer Bruno was "an f-ing B-I-T-C-H, an f-ing C-U-N-T. And he started bucking up his chest and beating on his chest." Officer Bruno called for backup assistance from Officer Jonathan Sloan. When Officer Sloan arrived about twenty

minutes into the observation period, Defendant urinated on the police station floor in front of the officers. At the end of the observation period, Officer Bruno requested that Defendant take a breathalyzer test. In response, Defendant was "bucking up and screaming he wasn't f-ing doing anything until . . . his lawyer comes." Specifically, Defendant was "bucking up his chest, beating on it. Like, look, you'll see what I'm going to do. Punching his fist, calling us names the whole time, the B word, the C word, F this, F that." Officer Bruno again asked Defendant to take a breathalyzer test; Defendant said "he wasn't f-ing blowing into it." Officer Bruno indicated on the test report that Defendant refused the breathalyzer test.

¶ 17 Officers Bruno and Sloan transported Defendant to the Carteret County Jail to be seen by a magistrate. Upon arrival, Defendant started "bucking up again and he was screaming, Mr. Kitchen is f-ing here" as they walked into the jail. The jailer asked Defendant to submit to another PBT, but Defendant said "that he wasn't doing sh-- until his lawyer gets there and that [the jailer] could stick it up his A-S-S." Because of Defendant's behavior and refusal to submit to the PBT, the jailer insisted that Defendant be taken to Carteret Health Care to be medically evaluated and cleared prior to being processed.

¶ 18 On the way to the hospital, Defendant again resisted getting into the patrol car; Officer Bruno described it as being like "the mattresses that you have rolled up that you undo them and they puff up, that's how it was trying to get him in the car."

Officers Bruno and Sloan had to push and pull Defendant to get him seated inside the vehicle and belted. Once at the hospital, security and medical personnel were waiting to meet Defendant. Officers Bruno and Sloan walked Defendant inside the hospital by holding his arms, as Defendant "was screaming and scaring all the patients in the hospital, screaming cuss words, telling everyone that, at this point, that [Officer Bruno] and Officer Sloan sexually assaulted [Defendant], and that Officer Sloan put his finger in [Defendant's] butt." The officers left Defendant in the hospital's care. Officer Bruno testified that the night she arrested Defendant, "stood out in my mind. It's probably one of the worst cases I've ever dealt with, or one of the worst subjects I've ever dealt with in any kind of case I've ever had to investigate or be a part of."

**D. Officer Jonathan Sloan**

¶ 19 Officer Jonathan Sloan of MCPD received a call from Officer Bruno that she needed back-up in the processing room because her arrestee was "acting belligerent." When he first encountered Defendant inside the processing room, "Defendant['s] appearance looked disheveled, and he appeared to be annoyed[.]" Much of Officer Sloan's testimony corroborated Officer Bruno's testimony regarding what occurred at the police station during the observation period, when the two officers took Defendant to the jail, and when they took Defendant to the hospital.

¶ 20 Officer Sloan was trained in apprehending and detecting impaired drivers, and

also was trained and certified to administer breathalyzer tests and standardized field sobriety tests. At the time of Defendant's arrest in May 2017, Officer Sloan had investigated and/or made arrests in approximately 100 impaired driving cases. In response to the question, "Did you have a sufficient amount of time with this defendant as to form an opinion as to whether he was impaired?" Officer Sloan testified that he spent "hours" with Defendant that night and he "formed an opinion that [Defendant] was appreciably impaired on alcohol."

**E. Medical Records**

¶ 21        After arriving at Carteret Health Care, Defendant was examined by medical staff who recommended that Defendant be involuntarily committed for treatment and submitted an Affidavit and Petition for Involuntary Commitment to a magistrate. The magistrate found that Defendant was "mentally ill and dangerous to himself or others" and ordered Defendant involuntarily committed to Carteret Health Care for custody and treatment.

¶ 22        Sherill Hand, the custodian of medical records at Carteret Health Care, retrieved the records from the archive related to Defendant's stay in the Carteret Health Care emergency room. She testified that the medical records were a "true and accurate copy of the medical records that were on file for [Defendant] for May 1 and 2, 2017." The medical records were introduced as evidence and admitted to the jury, over Defendant's objection.

¶ 23        The medical records indicate that hospital staff performed a psychiatric evaluation of Defendant, and completed medical intake, including recording Defendant's medical history and past diagnoses. Defendant did not sign the medical authorization treatment form; hospital staff noted on the form that "p[atient] was unable to sign." The records also indicate that medical personnel drew Defendant's blood between 9:42 p.m. and 10:39 p.m. for routine medical diagnosis and treatment. The records include a toxicology lab report containing the chemical analysis results of the blood draw, including the amount of alcohol registered in the blood sample. The records indicate that Defendant stayed overnight at the hospital before being released and taken to Carteret County Jail for processing.

**F. Paul Glover**

¶ 24        Paul Glover, former Branch Head of the Forensic Tests for Alcohol Branch of the North Carolina Department of Health and Human Services, and certified toxicologist, performed a conversion of the chemical analysis results provided in the medical records and determined that Defendant's blood alcohol concentration was 0.12 at the time of the blood draw. Glover described the process and mathematical calculations by which he came to this conclusion, including that the conversion ratio he used to convert the hospital's chemical analysis results into a blood alcohol

concentration level is accepted by the scientific community.

**G. Closing Arguments**

¶ 25      During its closing argument, the State argued, in part, as follows:

> You have his medical records.  I gave those to you.  They
> were admitted into evidence.  So you know he wasn't
> having some type of medical episode that could have caused
> this behavior.  His aggressiveness and belligerent nature
> suddenly appear when he realizes he's going to jail, and
> then it suddenly goes away when he sobers up.
>
> It wasn't a medical issue and it wasn't a mental health
> issue.  He was impaired.
>
> His medical records were admitted into evidence and it's
> because he went to the hospital that we have actual
> evidence of what his alcohol concentration was, since he
> refused the breath test.

¶ 26      Defendant argued in closing that the outcome of the case depended on whether

the jury accepted the reliability of the State's evidence that Defendant's blood alcohol

concentration was above the legal limit on the night in question, stating,

> [T]his case is about impairment.  And this is -- this is what
> it comes down to.  They called Mr. Kitchen a "0.12" and you
> have to believe, and be entirely satisfied and convinced of
> that number "0.12," despite not hearing any evidence of
> who ran that test, if it was done correctly, what it was done
> with.
>
> All that we know is that there was a number on a piece of
> paper that may have been auto-generated after they ran
> the test.  That's what you've got.
>
> And you have an expert that took his calculator and took
> that number, and divided it by another number and moved

the decimal. That's what the State presented to you on the number. You get to believe that that number is correct in this case.

The jury convicted Defendant of driving while impaired. Defendant pled guilty to having attained habitual felon status. The trial court entered judgment, sentencing Defendant to 144 to 185 months' imprisonment for habitual impaired driving as a habitual felon.

Defendant appealed.

## II. Discussion

Defendant argues that the trial court erred by denying his motion to suppress his medical records, which contained his blood alcohol concentration level at the time of Carteret Health Care's blood draw, because the medical records were obtained in violation of his Fourth Amendment right to be free from warrantless search and seizure. Defendant specifically contends that N.C. Gen. Stat. § 8-53, which allows a judge to compel disclosure of confidential medical information "if in [the judge's] opinion disclosure is necessary to a proper administration of justice[,]" was not a constitutional method for law enforcement to obtain Defendant's medical records. *See* N.C. Gen. Stat. § 8-53 (2020).

Assuming arguendo that the medical records were obtained in violation of Defendant's constitutional rights and that the records were improperly admitted at trial, these errors were harmless beyond a reasonable doubt. *See State v. Autry*, 321

N.C. 392, 399, 364 S.E.2d 341, 346 (1988) (concluding that the Court would not "address the question of whether the search was valid" where any error in the admission of the evidence obtained from the search was harmless beyond a reasonable doubt).

¶ 31    A violation of a defendant's federal constitutional rights "is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C. Gen. Stat. § 15A-1443(b) (2020). The burden is on the State to demonstrate, beyond a reasonable doubt, that the error was harmless. *Id.* "[T]he presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." *Autry*, 321 N.C. at 400, 364 S.E.2d at 346 (citation omitted).

¶ 32    "A person commits the offense of habitual impaired driving if he drives while impaired as defined in [N.C. Gen. Stat. §] 20-138.1 and has been convicted of three or more offenses involving impaired driving . . . within 10 years of the date of this offense." N.C. Gen. Stat. § 20-138.5 (2020).

> (a) A person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State:
>
> > (1) While under the influence of an impairing substance; or
> >
> > (2) After having consumed sufficient alcohol that he has, at any relevant time after the driving, an alcohol concentration of 0.08 or more. The results of a chemical analysis shall be deemed sufficient

evidence to prove a person's alcohol concentration[.]

N.C. Gen. Stat. § 20-138.1 (2020). The act of driving while under the influence of an impairing substance under subsection (a)(1) and the act of driving with an alcohol concentration of 0.08 or more under subsection (a)(2) are separate, independent, and distinct ways by which one can commit the single offense of driving while impaired. *State v. Perry*, 254 N.C. App. 202, 209, 802 S.E.2d 566, 572 (2017). Thus, the State may convict a person of driving while impaired for the act of driving while under the influence of an impairing substance under subsection (a)(1) where the person's blood alcohol concentration is entirely unknown or less than 0.08. *Id.*

¶ 33        A person is under the influence of an impairing substance if "his physical or mental faculties, or both, [are] appreciably impaired by an impairing substance." N.C. Gen. Stat. § 20-4.01(48b) (2020). Alcohol is an "impairing substance." *Id.* § 20-4.01(14a); *see State v. Phillips*, 127 N.C. App. 391, 393, 489 S.E.2d 890, 891 (1997) (citation omitted). "The effect must be appreciable, that is, sufficient to be recognized and estimated, for a proper finding that defendant was impaired." *State v. Harrington*, 78 N.C. App. 39, 45, 336 S.E.2d 852, 855 (1985). "Provided a determination of impairment is not based solely on the odor of alcohol, the opinion of a law enforcement officer . . . has consistently been held sufficient evidence of a defendant's impairment." *Perry*, 254 N.C. App. at 209, 802 S.E.2d at 572 (quotation marks, brackets, and citation omitted).

¶ 34        At trial, the State presented the following evidence that Defendant was driving while under the influence of an impairing substance:

¶ 35        Kirsten Lambert testified that Defendant "appeared intoxicated" when he pulled up to the drive-through window at Taco Bell. Sergeant Cummings, who was trained in detecting and apprehending impaired drivers, detected a strong odor of alcohol on Defendant's person when Sergeant Cummings pulled Defendant over for speeding. Sergeant Cummings testified that Defendant had slurred speech and glassy eyes, was unsteady on his feet, and "could not stand up straight without swaying, moving, shifting his feet and shifting his weight."

¶ 36        Officer Bruno was trained and experienced in detecting and apprehending impaired drivers. She testified that when approaching Defendant, she "noticed right away that [she] could smell alcohol, an alcoholic beverage. He had red, glassy eyes. And when [she] started speaking to him, he was slurring his speech." She observed that he was "showing signs of impairment," was sloppy and disheveled, and "couldn't stand up straight by any means."

¶ 37        Officer Bruno was also trained to administer PBTs and certified to perform standardized field sobriety tests. At the site of the traffic stop, Officer Bruno administered a PBT to Defendant. Although Defendant did not cooperate, the PBT registered a breath sample that was positive for alcohol. Officer Bruno testified that despite Defendant's failure to cooperate, the positive result was reliable.

¶ 38        Officer Bruno also administered three standard field sobriety tests: on the HGN test, Defendant manifested all six clues of impairment; on the OLS and WAT tests, Defendant started early, was unsteady on his feet, did not follow instructions, and would not complete the tests. Officer Bruno testified that the clues she registered on each test indicated impairment. Based on her interactions with Defendant for the twenty minutes she spent with him prior to his arrest, what she smelled, what she saw, and his performance on the tests, it was Officer Bruno's opinion that Defendant was "appreciably impaired."

¶ 39        Officer Sloan was also trained in apprehending and detecting impaired drivers and had investigated and/or made arrests in approximately 100 impaired driving cases. He spent "hours" with Defendant that night and "form[ed] an opinion that [Defendant] was appreciably impaired on alcohol."

¶ 40        This overwhelming evidence of Defendant's guilt of driving while impaired by driving "[w]hile under the influence of an impairing substance" under N.C. Gen. Stat. § 20-138.1(a)(1), renders any error in the denial of Defendant's motion to suppress his medical records and the subsequent admission of those records at trial "harmless beyond a reasonable doubt." *State v. Lawrence*, 365 N.C. 506, 513, 723 S.E.2d 326, 331 (2012); *cf. State v. Scott*, 278 N.C. App. 354, 2021-NCCOA-314, ¶ 15 (concluding that the erroneous admission of blood evidence was not harmless beyond a reasonable doubt where the only evidence of impairment, other than the blood samples, was that

defendant was speeding and recklessly driving). In light of our conclusion, we do not address Defendant's remaining arguments.

### III. Conclusion

The overwhelming evidence of Defendant's guilt of driving while impaired by driving "[w]hile under the influence of an impairing substance" under N.C. Gen. Stat. § 20-138.1(a)(1) renders any error in the denial of Defendant's motion to suppress his medical records and the subsequent admission of those records at trial harmless beyond a reasonable doubt. There was no prejudicial error in the trial court's judgment.

NO PREJUDICIAL ERROR.

Judges GORE and JACKSON concur.